---

### In re LAMB.

(Supreme Court, Appellate Division, First Department. June 23, 1905.)

**1. ATTORNEY—DISBARMENT—JURISDICTION OF COURT—OFFENSES COMMITTED IN OTHER JURISDICTIONS.**

The court has jurisdiction to disbar an attorney for misconduct committed outside of the state and in the United States court, and with respect to the process of that court, Code Civ. Proc. § 67, authorizing the court to disbar an attorney "guilty of any deceit, malpractice, crime or misdemeanor."

[Ed. Note.—For cases in point, see vol. 5, Cent. Dig. Attorney and Client, § 49.]

**2. SAME—MISCONDUCT—SUFFICIENCY TO WARRANT DISBARMENT.**

An attorney procured a person to institute a suit to restrain a corporation from retiring its stock, and induced him to verify a complaint alleging that he was and had been for six months last past the owner of a specified number of shares of stock and held the certificate therefor. The attorney made affidavit averring that he had read the complaint, and knew the facts therein stated, and that they were true. The attorney knew that plaintiff was not a stockholder of record, and that he had never owned any stock, and that he was a "dummy" for a holder of stock desirous of testing the legality of the act of the corporation in retiring its stock, who agreed to carry stock for plaintiff for the purpose of the suit. *Held,* that the attorney was guilty of perjury and subornation of perjury, warranting his disbarment.

[Ed. Note.—For cases in point, see vol. 5, Cent. Dig. Attorney and Client, §§ 50–54.]

Proceedings by the Bar Association of the City of New York for the disbarment of George Alfred Lamb, an attorney. Judgment of disbarment on report of referee.

Argued before McLAUGHLIN, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

J. Rider Cady and Ezra D. De Lamater, for respondent.

PER CURIAM. This is a proceeding brought against an attorney at law for improper and unprofessional conduct. On October 23, 1903, the petition and charges herein were presented to this court by the Association of the Bar of the City of New York, and the respondent moved to dismiss them, which motion was denied, and an order was entered on November 13, 1903, directing the respondent to show cause why he should not be suspended from

practice or removed from his office of attorney and counselor at law. On November 20, 1903, the respondent filed his answer to the petition, and by order dated December 30, 1903, the proceeding was referred to Hon. George B. Abbott to take proof upon the issues presented, and report the same to the court, together with his opinion in the premises. The referee proceeded to take proof, and on August 24, 1904, filed his report, sustaining the charges, and the petitioner now moved for an order confirming said report.

The charges are three in number, designated, respectively, "A," "B," and "C," and, in brief, are as follows:

### Charge A.

That on or about December 29, 1901, a suit was brought in a district court of the state of Minnesota, entitled "Peter Power v. Northern Pacific Railway Company," to restrain the defendant from retiring its preferred stock, the complaint, verified by said Peter Power, alleging "that plaintiff now is, and for more than six months last past has been, the owner and holder of 100 shares of the aforementioned stock (meaning common stock) of the defendant company, and now holds, and for more than six months last past has held, the certificates representing the issue thereof"; that such statement was relevant and material, and one of the solicitors for complainant in said suit testified on August 28, 1902, before a special examiner, that he prepared said complaint at the instance of said Lamb, the personal counsel of said Power, in reliance upon statements made by him, and the said Power testified before the special examiner that he verified the complaint upon the professional advice and representations of said Lamb; that on December 30, 1901, said Lamb, as counsel for said Power, swore to an affidavit intended for use and used in said cause, averring "that he has read the complaint of Peter Power against the Northern Pacific Railway Company, and is familiar with the facts therein set forth"; that said Lamb testified on August 11 and 21, 1902, and at other times, before the special examiner, that the basis for the allegation in the complaint and in his affidavit was that Camille Weidenfeld had agreed with him to "carry" 100 shares of said stock for any person acting as plaintiff in said suit, Peter M. Power testifying to the same effect; that Camille Weidenfeld testified on August 12, 1902, that no such transaction ever took place, and that Lamb had always told him Power was a stockholder; that the said Lamb well knew that the allegation in question was false when made, and that it was relevant and material in the suit, and procured said Power to make the statement to induce the court to believe Power a bona fide stockholder, and thus issue a temporary injunction against the defendant, and that the court was so misled, and issued such an injunction on December 30, 1901.

### Charge B.

That on December 30, 1901, the said cause was removed into the United States Circuit Court for the District of Minnesota, issue was joined, and on December 31, 1901, the injunction was dissolved; that by order of said court, dated January 14, 1902, a special examiner was appointed, who, on July 23, 1902, made an order that the taking of testimony in defendant's behalf should commence before him at 15 Broad street, New York City, July 29, 1902, and on July 24, 1902, upon petition of the secretary of the defendant, an order was made directing that a subpœna issue commanding Peter Power to appear before the special examiner to testify on July 29, 1902, and on July 24 and 25, 1902, copies of said petition and order, and original subpœnas thereunder, were duly served on Peter Power; that on said day Peter Power did not answer, nor did he appear, and said Lamb stated that he had advised his client not to come, because the service of the subpœna was improper and the court had no jurisdiction, and the special examiner ruled that the service was proper and Power should be produced, which said Lamb declined to do, and he did not appear until August 21, 1902; that on July 10, 1902, Peter Power went to West Hurley, N. Y., and on July 31, 1902, an order to show cause was

granted by Hon. Edward B. Thomas, United States judge, directing said Power to show cause why an attachment should not issue against him punishing him for contempt, and providing that service of the order and papers upon which it was based upon said Power prior to August 5, 1902, should be sufficient notice to him; that said order and papers were duly served upon said Power on August 4, 1902, at West Hurley, N. Y., and that fact was communicated to Lamb at the hearing that day; that said Lamb on August 11 and 12, and subsequently in August, 1902, testified that he went to West Hurley on the afternoon of August 4, 1902, and on the following morning he and said Power went from there to Rhinebeck Ferry, whence Lamb returned to New York and Power went to Montreal, Canada, in pursuance of an agreement between them, Lamb furnishing Power money to go to Montreal and to provide for his support while there; that the departure of Power from West Hurley to Montreal was advised by said Lamb, and the means furnished by him therefor, in order to put said Power beyond the reach of process, and prevent his attendance in obedience to the court's order and his testifying, which might reveal the falsity of the sworn statement in the complaint as to his ownership of the 100 shares of the defendant's stock; that on August 6, 1902, it was ordered that said Power was guilty of contempt and that he be arrested, and thereafter said Power was surrendered to the United States marshal and imprisoned, and having on August 21, 1902, testified in said suit, was released by order of the court.

### Charge C.

That on August 11, 1902, said Lamb, while duly sworn as a witness in said cause, was asked, "Q. Who took the certificate to Chicago?" (meaning a certain certificate for 100 shares of the defendant company) and replied, "I did;" and he also testified on that day, in reply to questions, that he brought the certificate back to New York; that in the meantime he handed it to Mr. Power, who had it quite some time, and, his recollection was, took it to Minneapolis, and returned it to him on the way back to New York; that it was a fact he carried the certificate himself to Chicago and delivered it to Mr. Power; that he was then asked, "Q. Is it a fact that Mr. Power retained possession of it until a few days afterward, when you started to return from Minneapolis?" and answered, "I won't say this, Mr. Guthrie, that I took the stock in my own physical possession, but I was in custody of it, and I was charged with the duty of seeing that it was safely kept;" that on August 12, 1902, Camille Weidenfeld testified that neither said Lamb nor said Power ever had possession of said certificate, unless during the trip to Chicago, while it was in the possession of Henry Stern; that on August 14, 1902, said Henry Stern testified that neither Lamb nor Power had obtained possession of such certificate on the trip to Chicago or at any time, so far as he knew, and that it was the property of Camille Weidenfeld, from whom he received and to whom he returned it; that Camille Weidenfeld produced such certificate at the hearing, and testified that it had never, to his knowledge, been in the possession or under the control of said Lamb, who also testified that he had never seen the certificate since its exhibition in Chicago; that said Lamb did not take such certificate to Chicago nor return it to New York, and was never in custody of it, and his statements to the contrary were deceitful, and made to deceive the court into the belief that said Power was a bona fide stockholder of the defendant company, and as such entitled to maintain the suit.

These charges, it appears from the affidavit of the secretary and attorney of the committee on grievances of the Association of the Bar of the City of New York, were received by him "in due form," and subscribed by and bearing the seal of the Northern Pacific Railway Company, "and that upon examination thereof he deemed said charges proper to submit to the committee." Except for changes in lettering and numbering, and the insertion of the word "petitioner" for "undersigned," the charges of the bar association are verbatim those submitted by the railroad company.

The answer to the petition and charges denied that, with respect to Charge A, respondent knew that said Power was not the owner and holder of the shares mentioned, or that the respondent made any untruthful statement or representation for the purpose of deceiving the court as alleged, and avers that the suit was begun and the complaint therein verified in good faith, and that respondent did not procure said Power to make any untruthful statement in said cause. The respondent denied with respect to Charge B that the departure of said Power from West Hurley was advised, and that the funds to support said Power were furnished by the respondent for the purpose of preventing said Power from testifying in the said cause, as alleged, in order to prevent the court from learning of the falsity of the sworn statement in said complaint; and he alleges that, so far as he advised said Power not to obey the service of the order, notice, and subpœna mentioned, he did so without intent to counsel any act which would constitute contempt of court, and never advised Power not to appear when, in his opinion, he should be served with lawful process, and that, when it was judicially decided that process and the service thereof were lawful, respondent went to Montreal and brought back the said Power to answer to the further order of the court in the premises. And with respect to Charge C the respondent denied that his statement that he took to Chicago the certificate mentioned and it was in his custody was deceitful, and made for the purpose of misleading the court into the belief that Power was a bona fide stockholder, and as such entitled to maintain the action mentioned; and he alleges that in so testifying he acted in good faith, and did have custody and control of said certificate, and in good faith so believed, and, if his testimony gave the impression that he had actual physical possession, that was corrected by his testimony that he did not so state, but was in the custody of it, and "charged with the duty of seeing that it was safely kept."

Upon the opening of the proceeding before the referee, the respondent moved to dismiss the charges upon the ground that the petition and charges fail to present any facts or accusation against the respondent of which this court has jurisdiction, it not being alleged that he was guilty of any deceit or wrongdoing under the law of this state, and that the acts complained of and stated in Charge A relate solely to alleged conduct of the respondent in an action pending in the courts of the state of Minnesota; that the facts alleged in Charge B relate wholly to the respondent's conduct in a judicial proceeding in the United States court of Minnesota and an examination held in the United States court of the Southern District of New York, and, if true, constitute at most contempt of the courts of the United States and their process; and that, with respect to Charge C, the testimony referred to was given in the United States court of Minnesota. The motion was denied, upon the ground that it had already been decided by the Appellate Division in making the order of reference to take testimony and report to that court. The respondent excepted.

The reference thereupon proceeded, and there was put in evi-

dence by the petitioner testimony of the respondent taken before the special examiner; and then in turn was given, before the referee, the testimony of Camille Weidenfeld, Henry Stern, and the respondent, Lamb, as to the facts involved, and several witnesses were called to testify to the general good character of the respondent.

The testimony of Weidenfeld and Stern relates solely to Charge A, and the referee was called upon, as is this court, to consider what was stated by them, and what was stated to the contrary by the respondent, and whether the statement of the respondent was such as to free him from the accusation made of deceit and wrongdoing. Upon the question of credibility, therefore, in connection with the general facts conceded, the whole inquiry must turn.

The respondent, in effect, has admitted that in December, 1901, Peter Power began a suit in the Minnesota courts against the Northern Pacific Railway Company to restrain it from retiring its preferred stock, and verified the complaint, alleging that he was, and for six months had been, the owner and holder of 100 shares of the company's stock, which was a material allegation, and that the respondent, as counsel for Power, averred in an affidavit made in that month that he had read the complaint, and was familiar with the facts alleged therein; and that the attorney who prepared the complaint in Minnesota did so at the instance of the respondent. We thus come to the crucial point of Power being the lawful owner of the stock in question, and, if not, whether the respondent knew it.

The respondent's testimony before the examiner and before the referee is substantially as follows: That he is 32 years old, and studied law in the office of Davies, Stone & Auerbach, being admitted to the bar in 1897; and in 1899 left that office and formed a partnership with George A. Voss, Esq., which continued for three years, his practice being general; and then formed a partnership with Daniel W. Guernsey, Esq.; that he met Camille Weidenfeld, of the firm of Lawson, Weidenfeld & Co., who gave him his first important case, and who became his principal client; that his relations with him were friendly and intimate, and he had charge of a number of active litigations for Weidenfeld's firm, and placed absolute reliance upon and confidence in him; that in May, 1901, Weidenfeld evinced a great interest in the affairs of the Northern Pacific Railway, and had many conversations with the respondent concerning the subject, and particularly with reference to the proposed merger or consolidation of the Great Northern and the Northern Pacific Railway Companies, and he looked the matter up on Weidenfeld's suggestion, and reported that he did not believe such merger was legal; that the retirement of the preferred stock of the Northern Pacific was a part of the general plan, as he understood it, and, in fact, the foundation thereof, and Weidenfeld said he had stock, and would like to see a test suit brought, but that if he brought it, with the Morgan interest against him, he would have every loan called, and would be ostracized, and that he could not afford to fight these influences, and if suit could be brought in the

name of some one else, who must be a man of standing, he would be glad to have it done and would pay for respondent's services, as it would be of great benefit to him to show whether the contemplated merger was legal or not; that Weidenfeld asked him who would be a safe man who could be trusted and relied upon to fight to a finish, a man of property and character, and he thought of Mr. Power, for whom he had done some legal work connected with his estate, and mentioned him to Weidenfeld; that Weidenfeld said he would be very glad to carry stock for Power, 100 shares, the stock to be assigned to him, and the identity of the men behind the suit to be concealed, so they might escape the business consequences, and it was agreed between Weidenfeld and the respondent that this should be done, and the respondent advised Power of the agreement, and that this stock was to be carried for him, and asked him if he was willing to act, and he said he was; that in May, 1901, Weidenfeld agreed to carry the stock for Power, and respondent understood that it was assigned to him, and that Weidenfeld was ready to deliver it whenever called for, and that Power's rights were the absolute ownership and control of that stock in consideration of his having agreed to act as agent of certain people, but the agreement was not in writing, and Power paid nothing for the stock; that in December, 1901, he advised his counsel in the West that Peter Power was a bona fide holder of the stock, having the right to call it, and was the owner of it, and had been for six months, and went himself to Minnesota, Weidenfeld knowing of his going, and giving him a check for $2,000 the day before to pay expenses and retain lawyers there; that he stopped in Chicago and retained lawyers, and went to St. Paul, where he saw the Governor of the state, who also wanted a suit brought to test the legality of the proposed action, and referred him to attorneys, and two days later the action of Peter Power v. Northern Pacific Railway Co. was begun, and motion for a preliminary injunction was made; that the case was transferred to the federal court after the injunction was granted; that in the court at Minneapolis the question was raised as to Power's ownership of stock (the complaint not alleging that he was a holder of record), and it was insisted that the stock be deposited in a trust company, and respondent at once returned to New York and saw Weidenfeld immediately, and told him that the stock must be sent there, and a week or nine days later—respondent having been busy in New York meanwhile—he and Power and a Mr. Stern, a commercial engineer in mining, who had been associated with Mr. Weidenfeld, and who had authority to draw on Weidenfeld's account with H. Content & Co., started for Chicago with a certificate (numbered H9355, in the name of H. Content & Co., for 100 shares, indorsed in blank dated July 8, 1901), which certificate Mr. Stern pinned to his undershirt; that Weidenfeld had given the respondent in New York a second check for $2,000, and had also drawn upon him from Chicago for about $1,200 to retain the Chicago lawyers; that Stern gave Power the money to buy the tickets, and he bought them for the three men to Chicago, all traveling together; that in Chicago the certificate was

exhibited to the attorneys, who had demanded it, and Stern said, "This is Power's stock," to all present, and that night Stern left for New York with the certificate, respondent meanwhile drawing money on H. Content & Co. or Weidenfeld, and advancing to Stern sufficient for his return expense, the balance of $1,000 drawn being given to the attorney in Chicago; that respondent did not personally return for two or three days, meanwhile bringing action against the Great Northern for Weidenfeld in the name of other parties; that Weidenfeld had sent Stern, as a man of discernment, to see the Chicago attorneys; that respondent absolutely believed all along that Power owned the stock, and otherwise he or Power could have bought it; that thereafter Weidenfeld gave Power money, one check being for $500.

Mr. Weidenfeld testified that he had business relations as client of the respondent, and that he had confidence in him, and that he may have conversed with him of the Northern Pacific Railway matter, as he was interested in it, but he had no recollection of any conversation in May, 1901, to the effect that, if respondent would get some reputable person to act as plaintiff, he (Weidenfeld) would carry 100 shares of stock for him; that in December, 1901, he became the owner of 100 shares of the stock of the Northern Pacific Railway Company, the certificate standing in the name of H. Content & Co., and, he believed, numbered H9355, and he never assigned it to Peter Power, and still owns it; that that certificate, by his authority, was taken by Mr. Stern to Chicago at the time mentioned, "for the purpose of intervention in the Power suit"; that he never agreed to carry stock for Power, and thought he never discussed Peter Power or the Northern Pacific matters with respondent; that a difficulty had arisen concerning respondent's compensation in matters in which he, with others, was interested, connected with certain transactions in gas stock, and until then his relations with respondent were pleasant; that prior to December, 1901, he may have been at different times the owner of Northern Pacific stock; that he did not know at the time that Mr. Stern, Power, and respondent went to Chicago together; that he did know respondent had previously been to St. Paul in connection with litigation against the Northern Pacific, and he did not know he went there to see the Governor of the state; that he purchased the 100 shares merely as a good investment; that he thought Mr. Stern had no definite instructions as to where he was to take the certificate—to Chicago, St. Paul, or Minneapolis—but was going to see certain attorneys (whom respondent has communicated with) of whom he learned either through Mr. Stern or Mr. Lamb; that he thought Mr. Stern was to take the stock on a trip to Montana, and did not know whether he went to Montana from Chicago or not; that Mr. Stern had authority to draw upon him, and may have done so, for the expenses of himself, Power, and respondent to Chicago; that respondent had told him that Power was a man of property and had the stock, and this he believed; that he asked respondent what the total expenses of the litigation were to be, and

understood he was to contribute $3,500, but, as matter of fact, he contributed $6,000, and had an understanding with respondent to that effect, but there was no understanding as to respondent's future fees; that he thought it desirable to test the question of whether the mergers were legal or not, and if legal it would be of some advantage to him, and if illegal there would be another scramble, as in May, for the stock, and he certainly had a business purpose in having the question tested.

It was agreed that Mr. Stern would testify, if present, that he went to Chicago on the day named with Power and Mr. Lamb, and that was the first time he knew he was the Peter Power in the suit: "Q. Well, Mr. Weidenfeld told you that if Mr. Lamb secured a good plaintiff or a responsible plaintiff— A. (interrupting) Or words to that effect. Q. Or words to that effect—he would be inclined to go into the litigation? A. Yes, sir"; that he took the certificate in the name of H. Content & Co. to Chicago, in an envelope pinned to his undershirt, and took it out in the attorney's office there, and showed it to the gentlemen present, who examined it, and then he took it back to New York that same day and handed it to Mr. Weidenfeld.

There was offered in evidence a ledger account of Mr. Weidenfeld with H. Content & Co., showing the purchase in December, 1901, of the certificate in question.

Upon this evidence the referee concluded that it affirmatively appears that the stock in question was never owned by Power, and hence he was not a bona fide holder thereof, and that the whole proceeding "savors of fraud, deceit, and duplicity," and that Charge A is established by the proof. The testimony of Mr. Weidenfeld and Mr. Stern corroborates that of the plaintiff, excepting as to the alleged agreement that Mr. Weidenfeld was to carry, assign, and hold for delivery to Power the stock in question. Thus Weidenfeld admits that he was respondent's client, that he was vitally interested in testing the proposed merger, that he talked with respondent of it, that he obtained the stock and may have had other stock, and authorized its being taken to Chicago, for the purpose, however, he says, of intervening in the suit; that "if Mr. Lamb secured a good plaintiff * * * he would be inclined to go into the litigation"; that he agreed with respondent to contribute to the expense of the litigation, and did contribute $6,000; that Stern did draw upon him, paying expenses of himself, Power, and respondent; and that he has financial interests at stake in the result. Stern admits that he paid both respondent's and Power's expenses, and does not deny that, when he showed the stock in Chicago to the attorneys named by respondent, he said it was Power's check.

With respect to Charge B, many of the alleged facts are admitted. Thus the respondent admits in effect that a special examiner was appointed and proposed to take testimony in New York, and that the subpœnas, orders, etc., directed to Power were issued, and that these papers were delivered to him at the times and places specified; that Power went to West Hurley, N. Y., and that, when the

order to show cause was granted why he should not be adjudged guilty of contempt, the respondent went to West Hurley, and on the following morning went to Rhinebeck Ferry with Power, who then took a train for Montreal, the respondent returning to New York; that it was thereafter adjudged that Power was in contempt, and decided that the service was good, and that the respondent who had sent moneys to Montreal to Power, went there for him and returned with him, surrendering him to the process of the court, and Mr. Power testified and was thereupon released from custody. It becomes necessary, therefore, to scan the respondent's testimony as to the explanation of his conduct, to determine whether it was such as calls for punishment.

The respondent testified that Power is a young man, 23 years of age, and, at the time the proceeding began before the special examiner, was engaged to be married; that both he and his fiancée were annoyed by the constant vigilance of detectives, and concluded to be married at once, and the ceremony was quietly performed, and Mr. and Mrs. Power went to West Hurley, N. Y.; that they were followed by detectives, who encamped day and night near the house where they were stopping, and they both became very nervous, and particularly Mr. Power, who was in bad health; that the respondent regarded the whole proceeding with respect to the service of papers unlawful and improper, and, acting under that belief, advised his client to pay no attention to them until it was finally determined whether such service was valid; that the validity of the service was being contested, and the respondent secured the assistance of other attorneys, and particularly Mr. Chandler, who agreed with him that the service was improper; that he so advised Power, and, upon seeing him in West Hurley after the order to show cause why he should not be held in contempt was issued, and finding him in such nervous condition, with the detectives constantly annoying him, consented to his going to Albany, and, when Mr. Power suggested Montreal, advised against it finally, and that, without his knowledge, Mr. Power went to Montreal, and from there telegraphed respondent of his act, saying he would there remain until the last possible moment; that when it was finally decided that papers were properly served—though the third service was held bad—respondent went to Montreal and returned with Mr. Power; that when he learned that Mr. Power was in Montreal he communicated with an eminent attorney there to keep track of him and supply him with funds needed for his mere support.

The petitioner calls attention to an apparent inconsistency in the respondent's testimony before the special examiner and before the referee. He testified before the former that when Mr. Power suggested going to Montreal he "exacted a solemn promise that he would instantly return if Judge Lacombe decided that he had been properly served and that he was in contempt of court," and that in "the matter of his going to Montreal I can only say it is myself who is to blame, and not Mr. Power. * * * I had some intention of sending him up into Dutchess county, and finally we agreed that he should go to Montreal, he first, however, giving me his

solemn promise that he would return immediately.  *  *  *  I
thought the best thing to do was to get Power out of West Hurley.
It happened that I had in Montreal a very strong man, I mean as
a lawyer, a king's counsel,  *  *  *  Farquhar S. MacLennan, so
I gave Power just sufficient money to get to Montreal and to cover
preliminary expenses, and I telegraphed MacLennan to look after
him and give him any funds that were necessary, but not to allow
him to get away." Before the referee, respondent testified that he
did not know Power had gone to Montreal till he got his telegram,
but was afraid he had; that he did not consent to it, and Mr. Power
had done what he asked him not to in going to Montreal; that his
previous testimony was not accurate; that he felt to "blame" be-
cause he did not take Power back to New York; that he had agreed
for him to go to Montreal, and then changed his mind at the sta-
tion, and insisted that he should not go. Before the examiner the
respondent had testified that he did not give anything to Mr. Power
to pay his expenses to Montreal, but had sent him money in Canada.
The referee, upon this testimony, concluded that the respondent was
guilty of the charge, and that his conduct was "gross unprofession-
al conduct and malpractice, which was highly reprehensible, and
more calculated to defeat than to further the ends of justice."

The third charge (B) is all contained in the testimony of the
respondent, wherein he stated that at Chicago he had actual cus-
tody of the certificate, whereas he finally admitted that he did not
mean to say he had physical possession of it, and Mr. Stern testi-
fied that the certificate was constantly in his own, and not the re-
spondent's possession. This charge the referee concluded was
interwoven with Charge A, and was proven.

In addition, the respondent contends that this court has no juris-
diction over his acts committed outside the state, and in the United
States court, and with respect to the process of that court. This
point is not well taken, since, as an attorney of this state, the re-
spondent was bound in all his acts to conduct himself properly,
or be prepared for proceedings such as those to be taken against
him. Section 67, Code.

Of all the charges, the most serious is Charge A, which is based
upon the fact that in the complaint in the Northern Pacific suit
there was the allegation that "plaintiff [Power] now is, and for
more than six months last past has been," the owner and holder of
100 shares of common stock of the Northern Pacific Railroad.
This complaint was enforced by an affidavit of Lamb that he had
read the complaint and knew the facts therein stated to be true.
It appears beyond dispute that Power was a "dummy," who, tak-
ing the respondent's own statement, had been brought into the
litigation by him in response to the suggestion made by Weiden-
feld that he should get some one who in his (Weidenfeld's) interest
would bring the suit to test the legality of the action of the railway
company in retiring its preferred stock, and that for such purpose he,
Weidenfeld, would carry 100 shares of the common stock for such
person's account. As matter of fact, Power never became a stock-
holder of record, nor was there a transfer to him of the certificate

which it is claimed represented his interest. He never, therefore, owned a single share of the stock of the company, either legally or equitably, and Lamb had as much knowledge of this fact as Power had himself.

There is no escape from the conclusion that not only did Lamb permit his client, Power, to swear to a false statement, but re-enforced it by his own affidavit, which, with respect to the ownership of the stock, was equally false. The charge of perjury and subornation of perjury, because it amounts to that, has been fully proven. Considering the purpose for which the suit was instituted, and the serious consequences resulting from its institution, and the deliberation with which the whole fraudulent scheme connected with that litigation was concocted and carried out by the respondent, we are convinced that he is unworthy of being continued as a member of the legal profession. There is no place within its ranks for perjurers and suborners. We cannot extend leniency in this case. The offense of the respondent cannot be attributed to the indiscretion of youth and mistaken zeal. His acts show singular fertility and complete deliberation in devising and executing the outrageous scheme by which he involved so many people in harassing litigation, and from the basest of motives.

Without considering in detail the other charges made against the respondent, and which the referee has reported are sustained, after a very careful reflection and examination of the whole situation, we are satisfied that the respondent should be disbarred.