# Richmond

RICHMOND ASSOCIATION OF CREDIT MEN, INCORPORATED v. THE BAR ASSOCIATION OF THE CITY OF RICHMOND, ET ALS.

January 14, 1937.

Present, All the Justices.

The opinion states the case.

*Edwards & Davenport* and *Alexander H. Sands*, for the appellant.

*Ralph T. Catterall* and *Henry C. Riely*, for the appellee.

*Gregory, Stewart & Montgomery* (New York City), *William B. Layton* (Portland, Ore.) and *Alexander H. Sands* (Richmond, Va.), for the National Association of Credit Men, *amicus curiae*.

EGGLESTON, J., delivered the opinion of the court.

This is a suit in equity wherein The Bar Association of the City of Richmond and others ask for a declaratory judgment, under chapter 254A of the Code of Virginia (section 6140a et seq.), that the Richmond Association of Credit Men, Inc. (hereinafter referred to as the credit association), is engaged in the unauthorized practice of law. From a decree holding that it is so engaged the credit association has taken this appeal.

The material agreed facts are as follows:

The Richmond Association of Credit Men, Inc., is a non-stock corporation organized under the laws of Virginia, with its principal office in the city of Richmond. Among its members are some of the leading business men and firms of that city. It is expressly stipulated that "None of them desires to violate the law and all wish a declaration from the court instructing them what the law is."

The credit association, as a part of its business, regularly engages in the collection of commercial, liquidated accounts. These it solicits from both its members and others.

It first undertakes to collect the claim by its own efforts, either through personal calls of an agent or by letters sent to the debtor. In case the debtor pays the claim to the credit association, the latter deducts for its services a percentage of the amount collected and fixed at the rate adopted by the

Commercial Law League of America.

There is no contention that such collections constitute the unauthorized practice of law, and hence we may dismiss without further consideration transactions of this character.

When the collection of a claim is first undertaken, it is "understood that if the association is unable to collect the claim without suit it is authorized by the creditor to employ an attorney at law for the creditor to collect the claim by bringing suit on it in the name of the creditor."

If the debtor fails to pay upon demand of the credit association, the latter so notifies the creditor and obtains from him express authority to select and employ a lawyer to collect the claim. The credit association then selects a lawyer for such purpose, and, without necessarily disclosing his name to the creditor, forwards to the lawyer the claim attached to the following form letter:

"RICHMOND ASSOCIATION OF CREDIT MEN, INC.
305 Travelers Building
RICHMOND, VIRGINIA

"Date...............
"Amount............
"In Re: ............................... This claim is
vs ..................................... sent to you be-
....................................... cause of your
....................................... listing in The
....................................... C-R-C Law List

"1. As agent for the creditor, we enclose the above claim for collection and remittance to our order, and you are to be governed by the following rates and conditions:

"RATES NET TO YOU—NO COLLECTION NO CHARGE

"9% on the first $500.00.

"6% on the next $500.00.

"3% on the excess of $1,000.00.

"$4.50 on claims between $15.00 and $50.00.

"30% on claims of $15.00 and under.

"SUIT FEE: $7.50 unless otherwise arranged; on claims under $30.00 you shall first deduct your commission and then

a fee for suit, but in no case shall your suit fee together with commission, plus our share of commission, exceed 50% of the amount collected.

"2. Retention of this claim will signify your acceptance of our terms. If these terms are not satisfactory; if claim is worthless; if you represent debtor, or for any reason you cannot attend to it, kindly return claim immediately.

"3. Fees and disbursements due on one claim cannot be deducted from another. Any fees or costs unpaid we will endeavor to collect for you, but under no circumstances are WE to be held personally responsible therefor.

"4. Incur no expense unless you have written authority. Unauthorized compromises will not be recognized.

"5. If suit is necessary and advisable, state what papers required and actual disbursements to be advanced, which must be accounted for in the final settlement of the case. If you recommend suit, advise us fully regarding debtor's financial condition, how soon judgment could be obtained, and the ultimate prospects of judgment being satisfied.

"6. Failure to acknowledge receipt of claim, answer letters or follow instructions will constitute a breach of this contract and give us the liberty to place duplicate claim with other representatives without NOTICE and without payment of commissions or other charges. IN THIS EVENT WE WILL REPORT ALL FACTS TO YOUR RECOMMENDER.

"7. Our bank does not charge exchange; therefore send us your checks. DEDUCTIONS FOR EXCHANGE WILL NOT BE ALLOWED.

"8. INTEREST MUST BE COLLECTED ON NOTES AND ON OPEN ACCOUNTS WHEN POSSIBLE."

The lawyer acknowledges receipt of, and agrees to handle the claim on the prescribed terms and conditions by filling in and returning to the credit association the following form:

"We have received the above-mentioned claim, which will be handled by us on the rates and conditions set forth in your

forwarding schedule, unless other arrangements are subsequently agreed to by you.

"PLEASE NOTE OUR ANSWERS TO THE FOLLOWING INQUIRIES:

"What are the prospects of collection? . . . . . . . . . . . . . . .

"Is debtor financially responsible? . . . . . . . . . . . . . . . . . . . .
Own real estate? . . . . . . . . . . . . . . . . . . . .

"Do you advise suit? . . . . . . . . If so, see paragraph No. 5 above and advise fully.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . , 19. . .

vs.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Amount $. . . . . . . .

"Richmond Assn. of Cr. Men, Inc., 305 Travelers Bldg., Richmond, Va.

"What would be the actual cost of suit? $. . . . . . . . . . . . . . .

"All advancements to cover court costs will be accounted for by us.

"If collection cannot be enforced by suit, what are the chances of collecting by dunning? . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Attorney."

If the lawyer collects the claim, either with or without suit, he deducts for his services the fee fixed by the schedule in the form letter, and remits the balance to the credit association. The latter deducts a fee for its services and remits the balance to the creditor.

If the claim cannot be collected without suit, the lawyer so notifies the credit association, and the latter in turn notifies the creditor. If the creditor desires suit brought, it so notifies the credit association, which transmits this information to the lawyer. All court costs are advanced by the creditor and transmitted to the lawyer through the credit association.

In all cases, whether collections are made by the lawyer with or without suit, the total compensation paid by the creditor to the lawyer and to the credit association, and the proportion thereof received by each, is in accordance with the rates adopted by the Commercial Law League of America,

and have been previously agreed to by the creditor.

Where collections are handled through lawyers, the only compensation received by the credit association is a percentage of the amount collected by the lawyer, which percentage is the same whether suit be necessary or not.

If the collection is with suit the lawyer receives an additional sum, called a "suit fee," no part of which is shared by the credit association.

In most cases, there is no direct contact or correspondence between the lawyer and the creditor. All letters written by the lawyer in regard to the claim, and all legal opinions with reference thereto, are sent by him to the credit association and by it transmitted to the creditor. Likewise, all communications from the creditor, including his decision with respect to bringing suit, the compromising of claims, etc., are sent by the creditor to the credit association and by it transmitted to the lawyer. In some few instances the lawyer may correspond directly with the creditor.

On these agreed facts the lower court held and decreed that the credit association was "engaged in the unauthorized practice of the law in the following ways: In the solicitation of persons, firms or corporations, whether members of defendant association or not, to turn over to defendant the collection accounts or debts with the understanding that defendant will employ for the creditor an attorney to prosecute the claim in court if necessary to collect it; in employing for creditors attorneys at law to collect claims for them in court; in conducting the business of acting as agent or broker to bring about the relationship of attorney and client between persons wishing to have debts collected and attorneys wishing to receive compensation for collecting debts; in furnishing to others for compensation the legal services of attorneys at law."

There is no claim here that the credit association is licensed to practice law. Indeed, it concedes that it cannot practice directly, and cannot do so indirectly by employing attorneys to practice for it. It further concedes that a lay agency,

having on its pay roll lawyers who perform legal services for its customers, for compensation paid into the treasury of such agency, is engaged in the unauthorized practice of law.

But it earnestly contends that it is not engaged in the practice of law, either directly or indirectly; that it merely acts as an intermediary in bringing together the creditor and the lawyer; that it establishes and maintains throughout the transaction the direct relation of attorney and client between the lawyer and the creditor; and that in performing the collection services the lawyer is acting for the creditor and not for it, the credit association.

The bar association, on its part, contends that the credit association is engaged in the business of conducting for profit an employment agency for lawyers; that it supplies to its customers, for a consideration, the legal services of attorneys selected by it; that it supervises and controls the conduct of such lawyers, and shares in the compensation which the creditors pay for the lawyers' services. The bar association further says that the credit association both renders, and holds out to the public that it will render, this service to its customers, and that such constitutes the unauthorized and unlawful practice of law.

In approaching the question here for decision we should bear in mind certain well-settled principles.

"The practice of law is not a business open to all, but a personal right, limited to a few persons of good moral character, with special qualifications ascertained and certified after a long course of study, both general and professional, and a thorough examination by a state board appointed for the purpose. The right to practice law is in the nature of a franchise from the State, conferred only for merit. It cannot be assigned or inherited, but must be earned by hard study and good conduct. It is attested by a certificate of the supreme court, and is protected by registration. No one can practise law unless he has taken an oath of office and has become an officer of the court, subject to its discipline, liable to punishment for contempt in violating his duties as such, and to sus-

pension or removal. It is not a lawful business except for members of the bar who have complied with all the conditions required by statute and the rules of the courts. As these conditions cannot be performed by a corporation, it follows that the practice of law is not a lawful business for a corporation to engage in. * * *

"The relation of attorney and client is that of master and servant in a limited and dignified sense, and it involves the highest trust and confidence. It cannot be delegated without consent, and it cannot exist between an attorney employed by a corporation to practice law for it, and a client of the corporation, for he would be subject to the directions of the corporation, and not to the directions of the client." *Re Co-Operative Law Co.*, 198 N. Y. 479, 92 N. E. 15, 16, 32 L. R. A. (N. S.) 55, 139 Am. St. Rep. 839, 19 Ann. Cas. 879.

Independent of statute, it is contrary to public policy for a corporation to practice law, directly or indirectly. Fletcher Cyclopedia Corporations (Perm. Ed.), volume 6, section 2524, page 251; *Re Co-Operative Law Co., supra; Meisel & Company v. National Jewelers' Board of Trade,* 90 Misc. 19, 152 N. Y. S. 913, 916; *Midland Credit Adjustment Co. v. Donnelley,* 219 Ill. App. 271, 275.

Limiting the members of the bar to those who possess the necessary moral and educational requirements is for the protection of the public and within the State's police power. *Bryce v. Gillespie,* 160 Va. 137, 168 S. E. 653.

Since an attorney is an officer of the court, the latter possesses the inherent power to supervise his conduct, both in and out of court, to the point of reprimanding or even removing him from office for misconduct. *Norfolk & Portsmouth Bar Ass'n v. Drewry,* 161 Va. 833, 836, 172 S. E. 282, and cases there cited.

It logically follows that the courts have the inherent power, apart from statute, to inquire into the conduct of any person—whether an individual, a lay agency, or a corporation—to determine whether he or it is usurping the functions of an officer of the court and illegally engaging in the practice

of law and to put an end to such unauthorized practice where found to exist. *People* v. *People's Stock Yards State Bank,* 344 Ill. 462, 463, 176 N. E. 901, 906; *State ex rel.* v. *Perkins,* 138 Kan. 899, 28 P. (2d) 765, 768; *In re Morse,* 98 Vt. 85, 126 A. 550, 553, 36 A. L. R. 527.

It is, therefore, of no moment in the present discussion that Code, section 3422 (as amended by Acts 1922, chapter 389, section 1), which prohibits the practice of law by an unlicensed person, does not define "the practice of law."

The precise argument advanced here—that the courts have no power to reach the unauthorized practice of law in the absence of a legislative definition of the term—was rejected in *Depew* v. *Wichita Ass'n of Credit Men,* 142 Kan. 403, 49 P. (2d) 1041, 1043.

It might as well be argued that section 105 of the Virginia Constitution, and section 5975 of the Code, which provide that no judge of this State shall "practice law" while in office, are unenforceable because neither the Constitution nor the Code defines the phrase.

As was aptly said in *People* v. *Merchants' Protective Corp.,* 189 Cal. 531, 209 P. 363, 365: "The phrase 'practicing law,' or its equivalent, 'the practice of law,' has long had a sufficiently definite meaning throughout this country to be given a place in both constitutional and statutory law without further definition."

As we have seen, the credit association holds itself out to be in the business of collecting liquidated, commercial accounts. It solicits such business both from its members and others. When it needs the services of a lawyer to aid it in the collection of one of these accounts it selects, makes contact with, and employs him. This employment is consummated by the form letter in which the credit association sends the claim to the attorney, and by the latter's written acknowledgment of the claim whereby he agrees to the terms and conditions imposed on him.

Although the creditor gives to the credit association express authority to employ a lawyer, it does not appear that at the

time of the employment the creditor—the supposed client—even knows the name of the attorney who has thus been selected and engaged to represent him.

While the letter on its face tells the lawyer that the credit association, "as agent for the creditor," is sending the claim to him, he is further told, in no uncertain terms, who is his master and who has control of the situation.

He is told in the letter that he has been selected not by his supposed client, the creditor, but by the credit association because his name is in the C-R-C List. He is next instructed that he is to be "governed" not by any agreement between him and his client, but "by the following rates and conditions" prescribed by the credit association.

He is further told that his charges have been fixed in advance in accordance with the schedule from which he may not deviate. He is informed that the schedule of rates are "net" to him. From this and the credit association's reference to "our share of the commission," he is advised, as he already knows, that the credit association is also making a charge to the creditor for his (the lawyer's) services in making the collection. In this connection it should be remembered that the creditor has previously been advised that the total amount of the collection charges of both the credit association and the lawyer will be governed by the rates of the Commercial Law League of America.

The lawyer is next informed that retention of the claim will signify his acceptance of the terms of the credit association, and if these are not satisfactory the claim should be returned. He is warned that failure to acknowledge receipt of the claim, or to answer letters, or to follow instructions "will constitute a breach of this contract and give us" (the credit association) the right to withdraw the claim.

In acknowledging receipt of the claim the lawyer agrees with the credit association, on the form prescribed by it, to handle the claim "on the rates and conditions set forth in your forwarding schedule, unless other arrangements are subsequently agreed to by you."

The other agreed facts show that the lawyer is to have no contact with his supposed client, for all correspondence regarding the claim must pass from the lawyer to the credit association and thence to the creditor. Remittances for collections are made in the same manner.

Under this arrangement we think it is clear that the credit association employs and has the right to discharge the lawyer, supervises and controls his conduct, gives orders to and receives reports from him, fixes his compensation, and is the real master in the situation.

It is equally clear that the total compensation paid by the creditor for the lawyer's services is shared by him and the credit association, for the latter receives a commission when the lawyer is successful in making the collection, and is paid nothing if the lawyer's efforts fail.

But the credit association argues that it only acts as the agent for the creditor; that it creates the relation of attorney and client between the lawyer and the creditor, and maintains this throughout the transaction. This may be technically true, but the real and complete authority, the control and direction over the lawyer, is lodged in the credit association and not in his so-called client with whom he has no direct contact.

The credit association admits that it would have no right to employ on its pay roll a staff of lawyers to engage in the business of prosecuting in the courts, for and in the name of the customers of the credit association, such claims as might be brought to it. The courts are unanimous in holding that this is the unauthorized practice of law.

In *re Maclub of America* (Mass.), 3 N. E. (2d) 272, 105 A. L. R. 1360, the highest court of Massachusetts recently condemned such as being the unauthorized practice of law. It pointed out that the lay agency and not the technical client dominated and controlled the services of the lawyer, and destroyed the confidential and fiduciary relationship which should exist between an attorney and his client.

And yet the technical relation of attorney and client might be created between the individual lawyer-employee of the lay agency and the customer. The court docket would, in

fact, show that the customer was represented not by the agency, but by the lawyer, and this relation, might obtain from the date of the institution of the suit until final judgment.

We thus see that the mere creation of the technical relation of attorney and client between the lawyer and the customer of the credit association is not controlling where the latter, in fact, directs and controls the services of the lawyer.

Therefore, despite the language in the contract that it is the "agent for the creditor," we are forced to the conclusion that by assuming and maintaining control over the services of the lawyer, the credit association has absorbed and destroyed the relation of direct personal confidence and responsibility which ought to exist between attorney and client.

In this connection we should recall that the 35th Canon of Ethics of the American Bar Association and of the Virginia State Bar Association provides:

"The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigent are not deemed such intermediaries." Virginia State Bar Association Reports (1935), volume XLVII, page 350.

We have examined all of the cases cited in the briefs and find, as counsel have frankly stated, that none is precisely in point. Other decisions dealing with the general subject are found in annotations in 73 A. L. R. 1327; 84 A. L. R. 749; 105 A. L. R. 1364.

Undoubtedly the present tendency of the courts is to restrict the field wherein lay agencies may legitimately conduct businesses of the type here under review. Whether this is due to a growing disposition of such agencies to invade the prohibited territory of the practice of law, or whether it is

due to more diligent efforts on the part of the bar to bring to light instances of such invasion, heretofore unchallenged, we need not inquire. The result has been as we have stated.

The case which most nearly resembles the situation with which we are confronted is that of *In re Shoe Mfrs. Protective Ass'n* (Mass.), 3 N. E. (2d) 746, decided by the highest court of Massachusetts on September 11, 1936. While not precisely in point it has many of the aspects of the case at bar.

There, the protective association did a large business in the collection and adjustment of commercial accounts for goods sold. Its method of procedure was to seek payment of the debtor by letter, by personal interview, and threats of legal action. It was generally understood between the association and its customers that if these methods failed, the association would have the right to forward the claim to some attorney selected by it, but only after first obtaining the permission of the customer to do so. The attorney and the creditor seldom corresponded directly with each other. In many cases the supposed client never knew who his attorney was. Except for a small "suit fee" the attorney retained 60% of the collection charges and paid the association 40%. All remittances were made to the customer through the association. The association fixed the attorney's charges, imposed conditions upon him, and supervised the conduct of the transaction. Thus far, the business of that association was very similar to that of the credit association here.

It is true that the protective association went further and furnished legal advice to its customers, and prepared legal documents for them. But the court condemned the whole business of the protective association as the unauthorized practice of law. It not only condemned the giving of legal advice and the drawing of legal documents, but had this to say of its further activities:

"It has employed attorneys to carry on litigation who are in effect its agents and whose dealings are with it alone, thereby furnishing or selling legal services and destroying the relation of direct personal confidence and responsibility which ought to exist between attorney at law and client and attempt-

ing to assume that relation in its own corporate capacity. It has done all of these things habitually and as part of the business which it carries on for profit. And it is a necessary inference from the facts found that it has held itself out as being entitled to do these things. All of these acts involve the practice of law."

To put a stamp of approval on the business of the credit association here would permit the combination of this corporation and the lawyer selected by it to do, for their joint benefit, that which neither could legally do. The corporation could solicit accounts for the very purpose of turning them over to such lawyer for collection. This the lawyer himself is forbidden to do by Code, section 3424 (as amended by Acts 1932, chapter 129). The lawyer in turn could then institute and prosecute in the courts of this State the necessary suits to enforce the collection of these claims. This the corporation admits that it cannot do.

If such business is to be permitted, what is there to prevent a group of lawyers from organizing a corporation to solicit in its name accounts to be turned over to and collected by such lawyers through the courts of this State, provided the necessary suits are instituted in the names of the creditors?

If a lay agency may engage for compensation in the business of employing lawyers to collect liquidated debts for others, why could it not run an agency to supply lawyers to perform other legal services—that is, to prosecute suits for unliquidated tort claims, unliquidated contract claims, and other suits, so long as such suits are prosecuted by the lawyers in the names of the claimants as their technical clients?

■ Our view is, that while technically the relation of attorney and client is established between the lawyer and the creditor, in the final analysis the credit association is the master and real client, since it selects the lawyer, employs him, fixes his compensation and shares therein, prescribes the term of his employment, and controls and directs his actions, even to the point of discharging him if it sees fit. All of which it holds out to its customers that it does and will do. In substance, we think, this is the business of supplying for a con-

sideration to others the legal services of lawyers, and is the practice of law by an unlicensed lay agency. Such is against the public policy of the State and violates Code, section 3422, as amended, as well.

The credit association also handles the collection of such commercial claims in bankruptcy. These it solicits and puts in the hands of lawyers selected, supervised, and controlled by it, in the same manner and to the same extent as the other collections of which we have spoken.

In such bankruptcy collections the creditor fills out and delivers to the credit association a proof of claim in which the latter "is hereby empowered to represent the said creditor in all matters relating to the said claim, in and out of court, and in the collection thereof." Such proof of claim is then delivered by the credit association to the attorney, who appears in the proceedings as counsel for the creditor. All of this is pursuant to agreement between the creditor and the credit association.

The lawyer deducts his charges from the amount collected and remits the balance to the credit association, which in turn deducts its charges and remits to the creditor. The total charges paid by the creditor, and the percentage thereof received by the credit association and the lawyer, respectively, is in accordance with the schedule of the Commercial Law League of America.

With respect to these matters the trial court was of the opinion that, since Congress has exclusive jurisdiction over cases in bankruptcy, "Any interference by a state court acting under a state statute with anyone engaged in the practice of law before a Federal tribunal would amount to an interference by one sovereign power with the functions of another sovereign power, each equal within its own sphere." It declined, therefore, to take jurisdiction of this phase of the case, and refused to make any finding as to whether or not such transactions, on the part of the credit association, constituted the unauthorized practice of law.

This action of the trial court is made the subject of a cross-assignment of error by the bar association.

It will be observed that none of the activities of the credit association itself—the solicitation of the accounts, the selection and employment of the lawyer, the supervision and control of his conduct, and the fixing and sharing in his compensation—take place in a Federal court.

If it is against the State's public policy for a corporation to conduct, in Virginia, an agency to furnish the legal services of lawyers in the State courts, is it not likewise against the public policy of the State for such corporation to be engaged, in this State, in the business of furnishing the legal services of lawyers in the Federal courts?

Can it be doubted that it is against the public policy of this State for a lawyer to solicit in his office or elsewhere, in Virginia, either directly or through a corporation, a damage suit to be brought in a Federal court?

■ The authorities are unanimous in holding that since an attorney is an officer of a State court, the latter has jurisdiction to inquire into his conduct in a Federal court itself, and disbar him for misconduct committed in that tribunal. 2 Ruling Case Law, page 1098, section 191; 6 C. J., page 583, section 38; *In re Lamb*, 105 App. Div. 462, 94 N. Y. S. 331, 340; *State ex rel. Hardin* v. *Grover*, 47 Wash. 39, 91 P. 564; *In re Simpson*, 9 N. D. 379, 83 N. W. 541, 553; *In re O—*, 73 Wis. 602, 42 N. W. 221, 226.

In *Norfolk & Portsmouth Bar Ass'n* v. *Drewry, supra,* this court upheld the jurisdiction of the State court to discipline or disbar an attorney, licensed in this State, for alleged misconduct committed in connection with proceedings in the United States District Court for the Eastern District of North Carolina.

Undoubtedly, therefore, in proceedings instituted for the purpose, this court would have jurisdiction to inquire into the conduct of the particular attorneys who are employed by the credit association to handle these claims in bankruptcy.

■ Likewise, since the credit association is a Virginia corporation, the State courts have jurisdiction and power to inquire into its actions and ascertain whether it is exceeding

its corporate powers and engaging in that which is contrary to the public policy of this State.

There is no claim that Congress or the United States courts have given to this Virginia corporation the right to practice law in such tribunals, either directly or indirectly. Therefore, we see in the present situation no conflict of jurisdiction between the Federal and State courts.

This precise point of jurisdiction has been before the courts, so far as we have been able to find, in but two other cases, and in each instance the State court held that it had the jurisdiction to determine whether a corporation chartered by that State was engaged in the unauthorized practice of law in connection with the handling of claims in bankruptcy.

In *Depew* v. *Wichita Ass'n of Credit Men, supra,* the lower court held that it was without jurisdiction to determine the matter. The Supreme Court reversed that part of the decree, saying (142 Kan. 403, 49 P. (2d) 1041, 1049): "We are of the opinion that the trial court did have jurisdiction in the matter of proceedings enumerated as taking place in bankruptcy proceedings in the Federal court, and could and should have made an appropriate conclusion which should have been to the effect that such acts on the part of the defendants as enumerated in finding No. 5 were the practice of law and such acts should therefore have been included in the injunction order."

The Supreme Court of the United States declined to review this decision of the Supreme Court of Kansas by denying a writ of *certiorari. Wichita Ass'n of Credit Men* v. *State ex rel. Beck,* 297 U. S. 710, 56 S. Ct. 574, 80 L. Ed. 997. While such action of the Supreme Court is not conclusive, it is, at least, highly persuasive that there was no substantial Federal question involved in the case.

In *Meisel & Co.* v. *National Jewelers' Board of Trade,* 90 Misc. 19, 152 N. Y. S. 913 (affirmed without opinion, 173 App. Div. 889, 157 N. Y. S. 1133), the jurisdiction of the State court was likewise upheld.

Our conclusion is that the trial court erred in declining

to take jurisdiction of these acts of the credit association in handling its collections in bankruptcy.

The decree of the lower court will be modified so as to include such acts of the credit association in handling its collections in bankruptcy, and as so modified will be affirmed.

*Modified and Affirmed.*