# Staunton

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ETC. v. A. S. HARRISON, JR., ATTORNEY GENERAL OF VIRGINIA, ET. AL.

N.A.A.C.P. LEGAL DEFENSE AND EDUCATIONAL FUND, INC. v. A. S. HARRISON, JR., ATTORNEY GENERAL OF VIRGINIA, ET AL.

September 2, 1960.

Record Nos. 5096, 5097.

Present, All the Justices.

The opinion states the case.

*Robert L. Carter* (*Oliver W. Hill*, on brief), for appellant, NAACP.

*Spottswood W. Robinson, III* (*Thurgood Marshall*, on brief), for appellant, NAACP Legal Defense and Education Fund, Inc.

*David J. Mays* (*John W. Knowles, Assistant Attorney General; Henry T. Wickham*, on brief), for appellees, A. S. Harrison, Jr., Attorney General, et al.

I'ANSON, J., delivered the opinion of the court.

·The National Association for the Advancement of Colored People, hereinafter referred to as the NAACP, and the NAACP Legal Defense and Educational Fund, Inc., hereinafter referred to as the Fund, appellants herein, filed their separate bills of complaint in the court below against Albertis S. Harrison, Jr., Attorney General of the Commonwealth of Virginia, the attorneys for the Commonwealth of the cities of Richmond, Newport News and Norfolk, and the counties of Arlington and Prince Edward, Virginia, appellees herein, to secure a declaratory judgment construing chapters 33 and 36, Acts of Assembly, Ex. Sess., 1956, codified as §§ 54-74, 54-78, 54-79, Code of 1950, as amended, 1958 Replacement Volume, and §§ 18-349.31 to 18-349.37,[1] inclusive, Code of 1950, as amended, 1958 Cum. Supp., as they may affect the appellants, their officers, members, affiliates of NAACP, contributors, voluntary workers, attorneys retained or employed by them or to whom they may contribute monies

---

[1] Now §§ 18.1-394 to 18.1-400, 1960 Cum. Supp.

and expenses, and litigants receiving assistance in cases involving racial discrimination, because of the activities of the NAACP and the Fund in the past or the continuation of like activities in the future.

The NAACP, in addition to seeking a construction of the aforementioned statutes, alleged that the statutes are unconstitutional and void because their enforcement would deny to it, its affiliates, officers, members, contributors, voluntary workers, attorneys retained or employed by it, and litigants whom it may aid, due process of law and equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States.

The two suits were heard and considered together in the court below, by consent of all parties, on the appellants' bills; their exhibits, which included a transcript of the evidence, exhibits, the majority and dissenting opinions of the three-judge federal court, and the judgment entered in the case of *National Association for the Advancement of Colored People* v. *Patty*, 159 F. Supp. 503 (judgment vacated and remanded *sub nom. Harrison, et al.* v. *National Association for the Advancement of Colored People*, 360 U. S. 167, 79 S. Ct. 1025, 3 L. ed. 2d 1152); the answers and exhibits of the appellees; and *ore tenus* testimony on behalf of the appellees and the NAACP, except one deposition taken on behalf of the NAACP. No testimony was taken on behalf of the Fund.

The court below held, so far as need here be stated, (1) that chapters 33 and 36 do not violate the constitutional guarantees of freedom of speech and assembly, due process of law and equal protection of the laws under the Fourteenth Amendment; (2) that the evidence shows that the appellants, their officers, affiliates, members, voluntary workers and attorneys are engaged in the improper solicitation of legal business and employment in violation of chapter 33 and the canons of legal ethics; (3) that attorneys who accept employment by appellants to represent litigants in cases solicited by the appellants, and in which they pay all costs and attorneys' fees, are violating chapter 33 and the canons of legal ethics; and (4) that the appellants and those associated with them advise persons of their legal rights in matters in which the appellants have no direct interest, and whose professional advice has not been sought in accordance with the Virginia canons of legal ethics, and as an inducement for such persons to assert their legal rights through the commencement of or further prosecution of legal proceedings against the Commonwealth of Virginia, any department, agency or political subdivision

thereof, or any person acting as an employee for either or both or any of the foregoing, the appellants furnish attorneys employed by them and pay all court costs incident thereto, and that these activities violate either chapter 33 or 36, or both.

The court's decree enumerated certain detailed activities of the appellants which do not violate chapters 33 and 36, and since they are not challenged by any of the parties hereto, they need not be stated herein.

From the decree of the chancellor we granted an appeal and *supersedeas* in each cause. They will be considered together by us, as they were in the court below, except the statutes involved will be considered separately.

The questions presented on these appeals are:

(1) Do the activities of the appellants, or either of them, amount to solicitation of business, prohibited by chapter 33?

(2) Do the activities of the appellants, or either of them, amount to an inducement to others to commence or further prosecute lawsuits against the Commonwealth, its officers, agencies, or political subdivisions, as prohibited by chapter 36?

(3) Do the provisions of either chapters 33 or 36 violate the Virginia Bill of Rights (Constitution § 12) and the Fourteenth Amendment to the Constitution of the United States?

The evidence shows that the NAACP and the Fund are non-profit membership corporations organized under the laws of the State of New York with authority to operate in this Commonwealth as foreign corporations. The NAACP and the Fund functioned as one corporation with the same officers, directors and members from 1911 until 1948, when, for tax purposes and other reasons, the Fund was organized as a separate corporation.

The principal purpose of the NAACP is to eliminate all forms of racial segregation. It has been described by its counsel as a political organization for those who oppose racial discrimination.

Affiliated with the NAACP are approximately one thousand unincorporated branches operating in forty-five states and the District of Columbia. The branches are chartered by the NAACP, and, for failure of the branch officers to follow strictly the policies and directives of the national body, their charters may be revoked or their officers removed. The branches are generally grouped together in each state into an unincorporated association. In Virginia the

association is known as the Virginia State Conference of NAACP Branches.

The State Conference holds annual conventions which are attended by delegates from the local branches. It takes the lead in NAACP's activities in this State under the administration of a full-time salaried executive secretary who is responsible to a board of directors. The executive secretary coordinates the activities of the branches in accordance with the policies and objectives of the Conference and the NAACP, supervises local membership and fund raising campaigns, distributes educational material dealing with racial matters, and performs many other duties.

The executive secretary, members of the legal staff, and other representatives of the State Conference make speeches before local branches and other groups for the purpose of advising those present that all segregation laws are unconstitutional and void, and urging them to challenge laws to eliminate segregation through the institution of legal proceedings which the State Conference, the NAACP and the Fund sponsor at no cost to the litigants.

The aid given litigants to initiate suits is in the form of furnishing lawyers who are members of the legal committee of the Conference, the NAACP, and regional counsel of the Fund, the payment of court costs and other expenses of litigation.

The Conference receives financial support to defray the cost of litigation it sponsors and other expenses from the local branches, the national bodies, and contributions.

Letters and directives addressed to officers of local branches and signed by the executive secretary of the Conference, filed as exhibits by the appellees, show the plans, methods and procedures used by the NAACP to sponsor litigation in school cases.

A letter dated May 26, 1954, reads in part as follows:

"It is of utmost importance that your branch retain the leadership in all actions engaged in in your community."

In a letter dated June 16, 1954, it is said:

"The Conference is proceeding with the development of its plan and will advise you thereof as soon as this work is completed."

A confidential directive of June 30, 1955, from the president and executive secretary to local branches relative to the handling of petitions for presentation to local school boards stated· in part as follows:

"Petitions will be placed only in the hands of highly trusted and

responsible persons to secure signatures of parents or guardians only. "The signing of the petition by a parent or guardian may well be only the first step to an extended court fight. Therefore, discretion and care should be exercised to secure petitioners who will—if need be—go all the way. * * *

"The Education Committee chairman will forward completed petitions to the Executive Secretary of the State Conference. * * *

"Following the above procedure, it becomes apparent that the faster your branches act the sooner will your school board be petitioned to desegregate your schools. Every act of our branch and the State Conference officials from this point on should be considered as an emergency action, and must take precedence over routine affairs—personal or otherwise."

Another directive contained in part these instructions:

"Organize the parents in the community so that as many as possible will be familiar with the procedure when and if law suits are begun in behalf of plaintiffs and parents.

"If no plans are announced or steps taken towards desegregation by the time school begins this fall, 1955, the time for law suits has arrived. At this stage court action is essential because only in this way does the mandate of the Supreme Court that a prompt and reasonable start towards full compliance become fully operative on the school boards in question.

"At this stage the matter will be turned over to the Legal Department and it will proceed with the matter in court."

An official report of NAACP and its Virginia Conference activities from May 17, 1954, to September 13, 1957, shows the purpose and a continuation of their method of operation as follows:

"UP TO DATE PICTURE OF ACTION BY NAACP BRANCHES SINCE MAY 31.

"A. Petitions filed and replies.

"A total of 55 branches have circulated petitions.

"B. Where suits are contemplated.

"Petitions have been filed in seven (7) counties/cities. Graduated negative response received in all cases.

"C. Readiness of lawyers for legal action in certain areas.

"Selection of suit sites reserved for legal staff.

"State legal staff ready for action in selected areas.

"D. Do branches want legal action.

"The majority of our branches are willing to support legal action

or any other program leading to early desegregation of schools that may be suggested by the National and State Conference officers. Our branches are alert to overtures by public officials that Negroes accept voluntary racial segregation in public education."

An explanation of the above report was made by the executive secretary of the Conference as follows: The language, "Where suits are contemplated," referred to places where petitions had been denied by local school boards; "Readiness of lawyers for legal action in certain areas," meant financial aid was available; and "Selection of suits reserved for legal staff," meant that members of the legal staff would pick the places where suits would be brought.

The State Conference maintains a legal staff of fifteen members, one of whom serves as chairman without compensation for that particular service. The members of the staff are elected at the annual convention of the Conference after being nominated by a committee, which in turn receives its recommendations for candidates from the chairman of the legal staff, and there have never been additional nominations from the floor of the convention.

The members of the legal staff of the Conference are reimbursed for expenses incurred in speaking before local branches and other groups and are paid fees at the rate of $60.00 per day for their services in cases in which NAACP has interested itself, "as long as such attorneys adhere strictly to NAACP policies;" namely, that a school case must be tried as a direct attack on segregation. Every item of expense and all legal fees paid by the Conference are approved by the chairman of the legal staff, except the expenses and fees of its chairman, which are approved by the president of the Conference. One member of the legal staff testified that he entered two of the school segregation cases at the suggestion of the chairman, and that the relationship "has been so pleasant and so profitable." Only members of the legal staff are selected by NAACP to bring suits in which it has an interest, and the places for bringing such suits are selected by the chairman, who refers the case to a member of the legal staff residing in the area from which the complaining party came. Without exception, when a member of the legal staff brings a lawsuit in his community other members of the staff are associated with him.

The chairman of the legal staff of the Conference is a member of the legal committee of the NAACP, Virginia counsel for the NAACP, and its registered Virginia agent.

The NAACP is not a legal aid society. Its policy during the past

several years has been not to participate in cases simply because Negroes need assistance on account of poverty. Assistance is given only in cases involving constitutional rights, and then only so long as litigants adhere to the principles and policies of the NAACP and the Conference.

The initial contact in the Charlottesville school segregation case was made by the president of the local branch of the NAACP when he requested the chairman of the legal staff to speak at a meeting of parents of certain school children. At this meeting some of the parents signed authorization forms for the chairman to represent such parents and their children in legal proceedings to desegregate the schools of that city. Other authorization forms were distributed and signed with no attorney's name appearing thereon, but the name of the chairman of the legal staff was inserted later.

In the Arlington school case, the petition presented to the local school board for desegregation of the schools was prepared by the State Conference, and most of the signatures were obtained by the vice-president of the Arlington branch, who was also one of the plaintiffs in a suit later instituted. She was told by the chairman of the legal committee of the Conference and the regional counsel of the Fund that they would institute legal proceedings if the school board denied the request to desegregate the schools.

All authorization forms used in the school segregation cases were prepared by the chairman of the legal staff and most of them authorized the attorney named therein to associate such other attorneys as he desired. Usually, the general counsel of the NAACP and the regional counsel of the Fund are associated in the trial of cases sponsored by the Conference, even though such association is not directly authorized by the litigants.

Ordinarily a complaint is filed with the executive secretary, who refers it to the chairman of the legal staff, and the chairman, with the concurrence of the president of the Conference, decides whether suit will be instituted. The executive secretary, however, testified that he did not refer any of the plaintiffs in the school segregation cases to the chairman of the legal staff.

Many of the litigants in school cases had no personal contact with any of the lawyers handling cases in which their names appeared as parties plaintiff, and learned of the institution of suits from newspaper accounts. Some of the litigants stated that they did not know the

names of the lawyers representing them, but they did know they were NAACP lawyers.

Only one witness, out of some twenty-four litigants in school cases, testified that he would have instituted legal proceedings if the NAACP had not agreed to finance them.

The Fund has a small membership and no affiliates. Its financial support comes from contributions solicited by letters and telegrams from New York City. The purpose of the Fund, as stated in its certificate of incorporation, is as follows:

"(a)  To render legal aid gratuitously to such Negroes as may appear to be worthy thereof, who are suffering legal injustice by reason of race or color and unable to employ and engage legal aid and assistance on account of poverty.

"(b)  To seek and promote the educational facilities for Negroes who are denied the same by reason of race or color.

"(c)  To conduct research, collect, collate, acquire, compile and publish facts, information and statistics concerning educational facilities and educational opportunities for Negroes and the inequality in the educational facilities and educational opportunities provided for Negroes out of public funds; and the status of the Negro in American life."

The director-counsel of the Fund is charged with the duty of carrying out the purposes set out in the charter and the policies fixed by its board of directors. He has under his direction a legal research staff of six full-time lawyers who reside in New York City but who may be assigned to places out of New York. In addition to the full-time legal staff, the Fund has five regional counsel, including one residing in Richmond, Virginia, at an annual retainer of $6,000. The Fund also has at its disposal social scientists, teachers of government, anthropologists and sociologists who are used principally in cases involving school litigation.

The regional counsel of the Fund residing in Richmond, Virginia, is also a member of the legal staff of the Conference and the legal committee of the NAACP.

The Fund has been approved by the State of New York to operate as a legal aid society because of the provisions of the barratry statute of New York, but counsel stated it does not operate as such. A representative of the Fund testified in the case of the *National Association for the Advancement of Colored People* v. *Patty, supra,* that it furnishes legal assistance when a Conference lawyer requests

it or when it is revealed from an investigation, made by the New York office through its regional counsel or one of the lawyers on the State Conference staff, that discrimination exists because of race or color. All costs and expenses incurred in such suits brought on behalf of Negroes are borne by the Fund. The assistance given may be in the form of providing lawyers to assist Conference staff lawyers in the trial of a case, or in the preparation of briefs.

Most of the litigants in the school segregation cases brought in this State were financially able, according to the standards set by the Fund, to finance their own proceedings.

██ The appellants contend that chapters 33 and 36 are: (1) penal statutes and should be strictly construed; (2) that the statutes are vague and ambiguous; (3) that the language of the statutes cannot be construed to apply to their activities; and in addition the NAACP says (4) if the statutes are construed to apply to their activities they are unconstitutional and void because they deny to it, its officers, employees, members, contributors, affiliates and attorneys the rights of freedom of speech and assembly, equal protection of the laws and due process of law under the Fourteenth Amendment to the Constitution of the United States.

Chapter 33 amends and re-enacts §§ 54-74, 54-78 and 54-79, Code of 1950. The pertinent parts of the chapter, with the amended parts in italics, are set out in the margin below.[2] These sections deal with

---

[2] Be it enacted by the General Assembly of Virginia:

1. That §§ 54-74, 54-78 and 54-79 of the Code of Virginia be amended and re-enacted as follows:

§ 54-74.

\*          \*          \*          \*          \*          \*

(6) "Any malpractice, or any unlawful or dishonest or unworthy or corrupt or unprofessional conduct", as used in this section, shall be construed to include the improper solicitation of any legal or professional business or employment, either directly or indirectly, *or the acceptance of employment, retainer, compensation or costs from any person, partnership, corporation, organization or association with knowledge that such person, partnership, corporation, organization or association has violated any provision of Article 7 of this chapter,* or the failure, without sufficient cause, within a reasonable time after demand, of any attorney at law, to pay over and deliver to the person entitled thereto, any money, security or other property, which has come into his hands as such attorney; *provided, however, that nothing contained in this Article shall be construed to in any way prohibit any attorney from accepting employment to defend any person, partnership, corporation, organization or association accused of violating the provisions of Article 7 of this chapter.*

\*          \*          \*          \*          \*          \*

§ 54-78. As used in this article:

*solicitation* of any legal or professional business or employment, either directly or indirectly, and provide for the disbarment of attorneys guilty of "malpractice, or [of] any unlawful or dishonest or unworthy or corrupt or unprofessional conduct."

The 1956 amendment to § 54-74, subsection (6), broadens the definition of "malpractice" to include the acceptance of employment from any person, partnership, corporation, organization or association with knowledge that such person, etc., has violated any provision of article 7, chapter 4, title 54, Code of 1950, (§§ 54-78 to 54-83, inclusive).

The amendment to § 54-78 broadens the definition of "runner" or "capper" to include any person, association or corporation acting as an agent for another person, association or corporation who or which employs an attorney in connection with any judicial proceeding in which such person, association or corporation is not a party and has no pecuniary right or liability therein.

The amendment to § 54-79 broadens the offense specified which theretofore made it unlawful for any person, corporation, partnership or association to act as a runner or capper for an attorney at law or to solicit any business for him, to make it unlawful for a person,

---

(1) A "runner" or "capper" is any person, corporation, partnership or association acting in any manner or in any capacity as an agent for an attorney at law within this State *or for any person, partnership, corporation, organization or association which employs, retains or compensates any attorney at law in connection with any judicial proceeding in which such person, partnership, corporation, organization or association is not a party and in which it has no pecuniary right or liability,* in the solicitation or procurement of business for such attorney at law * *or for such person, partnership, corporation, organization or association in connection with any judicial proceedings for which such attorney or such person, partnership, corporation, organization or association is employed, retained or compensated.*

*The fact that any person, partnership, corporation, organization or association is a party to any judicial proceeding shall not authorize any runner or capper to solicit or procure business for such person, partnership, corporation, organization or association, or any attorney at law employed, retained or compensated by such person, partnership, corporation, organization or association.*

(2) An "agent" is one who represents another in dealing with a third person or persons.

§ 54-79. It shall be unlawful for any person, corporation, partnership or association to act as a runner or capper * *as defined in* § 54-78 to solicit any business for * *an attorney at law or such person, partnership, corporation, organization or association,* in and about the State prisons, county jails, city jails, city prisons, or other places of detention of persons, city receiving hospitals, city and county receiving hospitals, county hospitals, police courts, * *county* courts, municipal courts, * courts *of record,* or in any public institution or in any public place or upon any public street or highway or in and about private hospitals, sanitariums or in and about any private institution or upon private property of any character whatsoever.

association or corporation to solicit any business for an attorney at law or any other person, corporation or association.

Violations of § 54-79 are made misdemeanors, and the license of any attorney violating any of the provisions of chapter 33 is subject to revocation or suspension.

While it is true that penal statutes are to be strictly construed, yet in construing such statutes the intention of the legislature must govern, and such intent may be found by giving to the words used their ordinary and usual meaning. *Tiller* v. *Commonwealth*, 193 Va. 418, 420, 69 S. E. 2d 441, 443; *Northrop & Wickham* v. *Richmond*, 105 Va. 335, 339, 53 S. E. 962, 963; *Gates & Son Co.* v. *Richmond*, 103 Va. 702, 706, 707, 49 S. E. 965, 966.

We find no vagueness or ambiguity in the language of chapter 33. The words used are clear and definite in their meaning.

It is clear from the language of the act that the intent and purpose of the legislature in amending and re-enacting chapter 33 was to strengthen the existing statutes to further control the evils of solicitation of legal business for the benefit of attorneys by a person who is not a party to a proceeding and in which he has no pecuniary right or liability. Solicitation of legal business has been considered and declared from the very beginning of the legal profession to be unethical and unprofessional conduct.

There is no merit in the contention of the appellants that the statutes cannot be construed to apply to their activities. When we apply the plain language and meaning of the statutes to the evidence, it is perfectly manifest that the NAACP, its Virginia Conference, its branches and the Fund are engaged in the unlawful solicitation of legal business for their attorneys, in which resulting litigation they are not parties and have no pecuniary right or liability, in violation of chapter 33.

The declared purpose of the NAACP and the Fund is to eradicate every form of racial discrimination. To accomplish this objective the NAACP has organized Negroes throughout the Commonwealth into branches, and formed a legal staff for the purpose of directing and controlling all actions pertaining to racial matters. Members of the NAACP, representatives of the Conference and its legal staff appear before the membership of local branches and other groups in communities in which the organizations wish suits to be brought and by persuasive methods urge those present to assert their constitutional rights to eliminate racial discrimination by becoming parties plaintiff

to legal proceedings, when many of the prospective litigants have had no previous thought of doing so. The services of attorneys selected by the NAACP, its Conference and the Fund are offered at no cost to the prospective litigants as an inducement to institute suits. The litigants and attorneys, however, must adhere to a policy of permitting the NAACP, the Conference and the Fund to direct and control the litigation.

The absence of the usual contact between many of the litigants and the attorneys instituting proceedings is indicative of the control of the litigation by the NAACP and the Conference.

Since the appellants do not operate as legal aid societies, the financial ability of litigants to prosecute their own cases is not considered by the NAACP, the Conference and the Fund in soliciting litigants. A person does not have to be indigent for the NAACP, the Conference and the Fund to pay all costs of litigation.

The communications and activities of the NAACP, the Conference and branches, indicate their plans, methods and procedures in obtaining litigants, and may be summarized as follows:

"* * * Mr. Thurgood Marshall, chief legal counsel of the NAACP, has said that the hardest job his staff has had in bringing equal-education suits has been to persuade Negro teachers and representative Negro parents to stand as plaintiffs. * * *." (*The National Association for the Advancement of Colored People; A Case Study in Pressure Groups*, St. James, Exposition Press, Inc., at p. 107.)

In short, the activities of the NAACP, its Conference and the Fund clearly show that they are engaged in fomenting and soliciting legal business in which they are not parties and have no pecuniary right or liability, and which they channel to the enrichment of certain lawyers employed by them, at no cost to the litigants and over which the litigants have no control.

There was evidence on behalf of the Fund in the record of the case of the *National Association for the Advancement of Colored People* v. *Patty, supra*, heard by the three-judge Federal court, and filed as a part of the record in these causes, that it participates in cases only when a prospective litigant appears and requests assistance. However, that does not appear to be the case under the additional evidence taken in these causes, much of which was heard *ore tenus* by the court below. Legal business is solicited by the NAACP, representatives of the Conference and its legal staff, of which the regional counsel for the Fund is a member, and he and the Fund

are fully acquainted with methods and procedures used to obtain litigants to whom the Fund gives assistance. The evidence shows that the regional counsel of the Fund is usually associated with Conference lawyers in school segregation cases, although he is not generally named in the authorization or power of attorney to institute suit.

There is no merit in the appellants' argument that their activities are not what are commonly considered by the legal profession as solicitation of business contrary to the canons of legal ethics. They rely on several cases which are readily distinguishable under the facts from these causes now before us. Typical of the cases cited is *Gunnels* v. *Atlanta Bar Association,* 191 Ga. 366, 12 S. E. 2d 602, 132 A. L. R. 1165.

In the *Gunnels* case the court upheld the right of the Atlanta Bar Association to furnish counsel to persons who had been victims of sharp loan practices. The attorneys did not receive compensation for their services and the Bar Association did not stand between counsel and client or exercise control over the litigation. The usual and proper relationship of attorney and client existed in that case, which does not exist under the evidence in the causes now before us.

In referring to the relationship that should exist between attorney and client, in the case of *Richmond Ass'n of Credit Men* v. *Bar Association,* 167 Va. 327, 189 S. E. 153, this Court quoted with approval the following (167 Va. at p. 335, 189 S. E. at p. 157):

" 'The relation of attorney and client is that of master and servant in a limited and dignified sense, and it involves the highest trust and confidence. It cannot be delegated without consent, and it cannot exist between an attorney employed by a corporation to practice law for it, and a client of the corporation, for he would be subject to the directions of the corporation and not to the directions of the client.' *Re Co-Operative Law Co.,* 198 N. Y. 479, 92 N. E. 15, 16, 32 L. R. A. (N. S.) 55, 139 Am. St. Rep. 839, 19 Ann. Cas. 879."

The acceptance of employment by an attorney in cases in which the NAACP, its Conference and branches act as intermediaries in the solicitation of legal business not only violates chapter 33, but also canons 35 and 47 of the canons of professional ethics adopted by this Court on October 21, 1938, 171 Va. p. xxxii.

Canon 35 reads in part as follows:

"*Intermediaries.*—The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate,

which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigent are not deemed such intermediaries." 171 Va. p. xxxii.

Canon 47 reads as follows:

"*Aiding the Unauthorized Practice of Law.*—No lawyer shall permit his professional services, or his name, to be used in aid of, or to make possible, the unauthorized practice of law by any lay agency, personal or corporate." 171 Va. p. xxxv.

In the Ninth Annual Report of the Virginia State Bar, p. 39, is found an opinion, rendered by the Committee on Unauthorized Practice, which is pertinent in these causes. A union retained an attorney on a salary basis to represent all of its individual members in their claims for compensation before the State Industrial Commission. He received no fees from the individuals for such representation. His sole compensation came from the salary paid him by the union. The committee held that the union was engaged in the practice of law without a license; that it was intervening between the attorney and his clients; and that the attorney was violating the canons of legal ethics.

Courts from other jurisdictions have held that corporations or associations carrying on activities somewhat similar to those of the appellants were engaged in the illegal practice of law and their attorneys were violating the canons of legal ethics.

*In re Maclub of America, Inc.*, 295 Mass. 45, 3 N. E. 2d 272, 105 A. L. R. 1360, an automobile association had been formed for the purpose of furnishing its members with lists of attorneys who would perform services for such members free of charge. The attorneys looked to the association for payment, but the association took no part in the direction or control of the case. The court held that the association was engaged in the illegal practice of law; that the relationship of attorney and client did not exist between the association's members and the attorney; that the particular attorney was compensated by the association and subject to its instructions; that the association possessed the right to hire and fire; and that the practice was considered a contract to furnish legal assistance rather than a contract to pay for legal assistance.

In *People ex rel. Courtney* v. *Association of Real Estate Tax-payers*, 354 Ill. 102, 187 N. E. 823, 826, a corporation was organized to permit united protection of certain taxpayers in matters of taxation and legislation. The owners of real estate were invited to become members by the payment of a fee. Attorneys were selected and paid by the corporation to represent it in taxation litigation and the corporation would determine what questions would be litigated. The court held that, even though suits were brought in the names of individual members, and fees would have cost an individual approximately $200,000, the corporation was engaged in the illegal practice of law.

For other cases, see *People ex rel. Chicago Bar Association* v. *Chicago Motor Club*, 362 Ill. 50, 199 N. E. 1; (a non-profit corporation) *Doughty* v. *Grills*, 37 Tenn. App. 63, 260 S. W. 2d 379; *Hildebrand* v. *State Bar of California*, 36 Cal. 2d 504, 225 P. 2d 508; *Atchison, Topeka & Santa Fe Railway Co.* v. *Jackson* (10 Cir.), 235 F. 2d 390, 393; *In re Brotherhood of Railroad Trainmen*, 13 Ill. 2d 391, 150 N. E. 2d 163, 167.

The appellants also argue that because they are aiding others in asserting their constitutional rights chapter 33 should not be construed to limit their activities. This argument is without merit. Statutes enacted by the General Assembly in the public interest to regulate the practice of law cannot be violated, and canons of legal ethics should not be ignored simply because constitutional rights are asserted. The law provides a procedure for one to follow in asserting his constitutional rights, as well as all other legal rights, and the objective may be achieved without violating statutes and the standards of the legal profession.

The NAACP next contends that chapter 33 is unconstitutional and void because it violates the rights of freedom of speech and assembly, and denies to it, its affiliates, officers, employees, voluntary workers, attorneys and contributors due process of law and the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States. There is no merit in this contention.

In support of the argument that chapter 33 violates their rights of freedom of speech and assembly, protected under the First Amendment and guaranteed by the Fourteenth Amendment to the Constitution of the United States, they rely on such cases as *Watkins* v. *United States*, 354 U. S. 178, 77 S. Ct. 1173, 1 L. ed. 2d 1273; *Sweezy*

v. *State of New Hampshire*, 354 U. S. 234, 77 S. Ct. 1203, 1 L. ed. 2d 1311; and *Thomas* v. *Collins*, 323 U. S. 516, 65 S. Ct. 315, 89 L. ed. 430.

In the *Watkins* case, *supra*, a congressional committee inquired of a witness as to his past associations and he refused to identify his associates during that period on the ground that he did not believe they were now identified with the Communist Party and the questions asked were "outside the proper scope of the committee's activities." On appeal from his conviction for contempt, the Supreme Court held that the pertinency of the question had not been shown; that Congress had not authorized the committee to make an investigation of this nature; and that a conviction for contempt for refusal to answer could not be sustained.

In *Sweezy* v. *State of New Hampshire, supra*, the witness, a teacher in the State university, refused to tell a committee of the state legislature the substance of a lecture he had given at the university, or anything about his opinions and beliefs, on the grounds that the questions were not pertinent to the inquiry and infringed on his freedom of speech, protected under the First Amendment. The court held that the witness was not in contempt, since the resolution of the legislature authorizing the inquiry was not broad enough to permit the question.

Obviously, the holdings in the *Watkins* and *Sweezy* cases have no application here, since the court's decisions rested on the relevancy and pertinency of the questions asked by the committees.

It is true that under the holding in the case of *Thomas* v. *Collins, supra*, representatives of the NAACP and the Conference have a right to peaceably assemble with the members of the branches and other groups to discuss with and advise them relative to their legal rights in matters concerning racial segregation. But under the evidence of the causes before us the appellants and their associates go beyond that. They solicit prospective litigants to authorize the filing of suits by NAACP and Fund lawyers, who are paid by the Conference and controlled by NAACP policies, in violation of chapter 33.

Chapter 33 does not deny the appellants, or those associated with them, freedom to speak and assemble. The purpose and intent of the chapter is to regulate the practice of law and to bring such practice in harmony with the ethical standards of the profession. It prohibits, under certain circumstances, the solicitation of legal business. The

prohibition of solicitation of legal business is merely a regulation in the interest of the publc and the legal profession.

A State, under its police power, has the right to require high standards of qualifications and ethical conduct from those who desire to practice law within its borders (*Bradwell* v. *Illinois*, 83 U. S. (16 Wall.) 130, 139, 21 L. ed. 442; *Schware* v. *Board of Bar Examiners of the State of New Mexico*, 353 U. S. 232, 77 S. Ct. 752, 756, 1 L. ed. 796, 64 A. L. R. 2d 288), and it may revoke or suspend the license to practice law of attorneys who are guilty of unethical conduct. *Richmond Association of Credit Men* v. *Bar Association*, 167 Va. 327, 334-336, 189 S. E. 153, 157; *Campbell* v. *Third District Committee*, 179 Va. 244, 249, 250, 18 S. E. 2d 883, 885.

A statute which forbids laymen to solicit employment for attorneys, or engage in the business of furnishing attorneys to render legal services, is a valid police regulation not violative of any constitutional restriction. *McCloskey* v. *Tobin*, 252 U. S. 107, 40 S. Ct. 306, 64 L. ed. 481; *Hightower* v. *Detroit Edison Co.*, 262 Mich. 1, 247 N. W. 97, 86 A. L. R. 509; *Kelley* v. *Boyne*, 239 Mich, 204, 214 N. W. 316, 53 A. L. R. 273; *Chicago, B. & Q. R. Co.* v. *Davis*, 111 Neb. 737, 197 N. W. 599, 601; 14 C. J. S., Champerty and Maintenance, § 35, p. 381; Anno. 53 A. L. R., p. 279-280.

We shall now direct our attention to chapter 36 (§§ 18-349.31 to 18-349.37, inclusive, Code of 1950, as amended, 1958 Cum. Supp.) Acts of Assembly, Ex. Sess. 1956, p. 37, the pertinent parts of which are printed in the margin.[3]

---

[3] Be it enacted by the General Assembly of Virginia:

1. § 1.(a) It shall be unlawful for any person not having a direct interest in the proceedings, either before or after proceedings commenced:

to promise, give or offer, or to conspire or agree to promise, give or offer, or to receive or accept, or to agree or conspire to receive or accept, or

to solicit, request or donate,

Any money, bank note, bank check, chose in action, personal services or any other personal or real property, or any other thing of value, or any other assistance as an inducement to any person to commence or to prosecute further any original proceeding in any court of this State, or before any board or administrative agency within the said State, or in any United States court located within the said State against the Commonwealth of Virginia, any department, agency or political subdivision thereof, or any person acting as an officer or employee for either or both or any of the foregoing; provided, however, this section shall not be construed to prohibit the constitutional right of regular employment of any attorney at law, for either a fixed fee or upon a contingent basis, to represent such person, firm, partnership, corporation, group, organization or association before any court or board or administrative agency.

(b) It shall be unlawful for any person, not related by blood or marriage or who

This chapter, like chapter 33, deals with the regulation and supervision of the practice of law and is a valid legislative enactment under the State's police power unless it invades rights protected and guaranteed by the State and Federal Constitutions.

The NAACP contends that the chapter is unconstitutional and void because it violates the rights of freedom of speech and assembly and denies to it, its officers, employees, voluntary workers, attorneys and contributors due process of law and the equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States.

On the other hand, the appellees say that the chapter does not violate any constitutional guarantees, and that under the evidence the appellants have violated the statute, which is merely a common law definition of maintenance[4] with the recognized exceptions.

---

does not occupy a position of trust or a position in loco parentis to one who becomes the plaintiff in a suit or action, who has no direct interest in the subject matter of the proceeding and whose professional advice has not been sought in accordance with the Virginia canons of legal ethics, to advise, counsel or otherwise instigate the bringing of a suit or action against the Commonwealth of Virginia, any department, agency or political subdivision thereof, or any person acting as an officer or employee for either or both or any of the foregoing.

(c) As used in this act, "person" includes person, firm, partnership, corporation, organization or association; "direct interest" means a personal right or a pecuniary right or liability.

(d) Any person violating any of the provisions of § 1 of this act shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than one thousand dollars or confined in jail for not more than one year, or both.

     *       *       *       *       *       *

§ 6. This act shall not be applicable to attorneys who are parties to contingent fee contracts with their clients where the attorney does not protect the client from payment of the costs and expense of litigation, nor shall this act apply to a mandamus proceeding against the State Comptoller, nor shall this act apply to any matter involving zoning, annexation, bond issues, or the holding or results of any election or referendum, nor shall this act apply to suits pertaining to or affecting possession of or title to real or personal property, regardless of ownership, nor shall this act apply to suits involving the legality of assessment or collection of taxes or the rates thereof, nor shall this act apply to suits involving rates or charges or services by common carriers or public utilities, nor shall this act apply to criminal prosecutions, nor to the payment of attorneys by legal aid societies approved by the Virginia State Bar, nor to proceedings to abate nuisances. Nothing herein shall be construed to be in derogation of the constitutional right of real parties in interest to employ counsel or to prosecute any available legal remedy under the laws of this State. The provisions hereof shall not affect the right of a lawyer in good faith to advance expenses as a matter of convenience but subject to reimbursement.

[4] Maintenance is "an officious intermeddling in a suit that in no way belongs to one by maintaining or assisting either party with money or otherwise to prosecute or defend it." 4 Blackstone's Commentaries, p. 135. See also 10 Am. Jur., Champerty and Maintenance, § 1, p. 549.

Section 1(a) of the act makes it unlawful, with certain exceptions, for any person not having a "direct interest" in a legal proceeding to promise, give, offer, donate money, personal services, or any other thing of value, or "any other assistance as an inducement to any person *to commence or to prosecute further* any original proceeding in any court of this State, or before any board or administrative agency within the said State, or in any United States court located within the said State against the Commonwealth of Virginia," its agencies or political subdivisions, or any officer or employee thereof. (Emphasis added.)

Section 1(b) makes it "unlawful for any person, not related by blood or marriage or who does not occupy a position of trust or a position in loco parentis to one who becomes the plaintiff in a suit or action, who has no direct interest in the subject matter of the proceeding and whose professional advice had not been sought in accordance with the Virginia canons of legal ethics, to *advise, counsel or otherwise instigate* the bringing of a suit or action against the Commonwealth of Virginia, any department, agency or political subdivision thereof, or any person acting as an officer or employee for either or both or any of the foregoing." (Emphasis added.)

We have frequently said that the test of the constitutional validity of a law is not merely what has been done under it, *but what may by its authority be done. Edwards* v. *Commonwealth,* 191 Va. 272, 285, 60 S. E. 2d 916, 922; *Richmond* v. *Carneal,* 129 Va. 388, 393, 106 S. E. 403, 405, 14 A. L. R. 1341; *Violett* v. *City of Alexandria,* 92 Va. 561, 574, 23 S.E. 909, 913, 31 L. R. A. 382.

Under § 1(a) a friend or neighbor of a poor man is prohibited from aiding him in asserting his claim against the Commonwealth, its agencies or political subdivisions, if his claim does not fall within the exceptions enumerated in § 6 of chapter 36, no matter how meritorious it may be.

The law has always recognized the right of one to assist the poor in commencing or further prosecuting legal proceedings. To deny this right would be oppressive and enable the other party, if his means so permits, an advantage over one with little means. Aiding the indigent is one of the generally recognized exceptions to the law of maintenance. *Gilman* v. *Jones,* 87 Ala. 691, 5 So. 785, 786-787; *Rice* v. *Farrell,* 129 Conn. 362, 28 A. 2d 7, 9; 14 C. J. S., Champerty and Maintenance, § 24, p. 368; 4 Blackstone's Commentaries, ch. 10, pp. 135 et seq.

This section denies to an indigent person free access to the courts, both State and Federal, except those within the enumerated class under § 6 of chapter 36, which is a fundamental right of all men, and denies to him due process of law.

A person who desires to aid an indigent suitor, unless his case falls within the excepted class, is deprived, under the terms of the act, of his fundamental right to use his property in a lawful manner and is made criminally liable if he does give such aid.

Where the principle of free discussion is concerned, it is the statute and not the accusation or the evidence under it which prescribes the limits of permissible conduct. *Thornhill* v. *Alabama*, 310 U. S. 88, 60 S. Ct. 736, 84 L. ed. 1093.

Under § 1(b) of the act, no person or association, including the appellants, except those within the excepted classification, may advise or counsel any person or group with respect to instituting or prosecuting actions against the State, its agencies or political subdivisions, or their officers or employees, to assert what these persons or groups may believe are their legal or constitutional rights. Nor may the appellants render financial aid to these people in such litigation, even though the litigants may select and employ counsel of their own choosing, in accordance with the recognized canons of legal ethics.

This section denies the right of freedom of speech, guaranteed by the Virginia Bill of Rights (Constitution § 12), secured by the First Amendment to the Constitution of the United States and guaranteed by the Fourteenth Amendment, which give one the right to hold views on all controversial questions, to express such views, and to disseminate them to persons who may be interested, and neither the Federal nor State government can take any action which might prevent such free and general discussion of public matters as may seem to be essential to prepare people for an intelligent exercise of what they may consider to be their rights as citizens. See 16 C. J. S., Constitutional Law, § 213(1), pp. 1093, 1094, and the many cases there cited.

A State may forbid one to practice law without a license, but it cannot prevent an unlicensed person from making a speech before an assembly, telling them of their rights and urging them to assert same. See *Thomas* v. *Collins, supra*, (concurring opinion, 323 U. S. 516, p. 544, 65 S. Ct. 315, 89 L. ed. 430).

State statutes must be specifically directed to acts or conduct which overstep legal limits, and not include those which keep within the protected area of free speech. *Edwards* v. *Commonwealth, supra* (191 Va. at p. 285, 60 S. E. 2d at p. 922).

While the appellants, and those associated with them, cannot solicit and channel legal business to attorneys whom they pay, and who are subject to their directions, in violation of chapter 33, a statute which prohibits them from advising any person or group to institute suits for the purpose of asserting what they believe to be their legal rights is a denial of the right of freedom of speech, and is unconstitutional and void.

Section 1(b) not only violates the right of freedom of speech, but § 6 of the act exempts from its operation a host of potential litigants, and says in effect that what is a criminal act when done by unexcepted litigants, including the appellants, is not a criminal act when done by excepted litigants. There is no reasonable basis for excepting a great number of litigants from the application of the act while making it applicable to others. Thus it denies to the unexcepted litigants the equal protection of the laws.

Equal protection of the laws, guaranteed under the Fourteenth Amendment, does not preclude a State from resorting to classification for purposes of legislation, but such classification must be reasonable and not arbitrary, and rest on some ground of difference or distinction which bears a fair and substantial relation to the subject or object of legislation, so that all persons similarly situated shall be treated alike. *C. I. T. Corp.* v. *Commonwealth,* 153 Va. 57, 68, 149 S. E. 523, 525, 526; *Bryce* v. *Gillespie,* 160 Va. 137, 143, 168 S. E. 653, 655.

For the reasons given, we hold:

(1) That chapter 33 is a valid regulation of the practice of law, enacted under the police power of the State, and is not violative of any constitutional restrictions;

(2) That the solicitation of legal business by the appellants, their officers, members, affiliates, voluntary workers and attorneys, as shown by the evidence, violates chapter 33 and the canons of legal ethics;

(3) That the attorneys who accept employment by appellants to represent litigants in suits solicited by the appellants, or those associated with them, are violating chapter 33 and the canons of legal ethics;

(4) That chapter 36 is unconstitutional and void because it violates

the right of freedom of speech under both the State and Federal Constitutions, and denies due process of law and equal protection of the laws under the Fourteenth Amendment. Therefore,

(a) the appellants and those associated with them may not be prohibited from acquainting persons with what they believe to be their legal rights and advising them to assert their rights by commencing or further prosecuting a suit against the Commonwealth of Virginia, any department, agency or political subdivision thereof, or any person acting as an officer or employee of such, but in so advising persons to commence or further prosecute such suits the appellants, or those associated with them, shall not solicit legal business for their attorneys or any particular attorneys; and

(b) the appellants and those associated with them may not be prohibited from contributing money to persons to assist them in commencing or further prosecuting such suits, which have not been solicited by the appellants or those associated with them, and channeled by them to their attorneys or any other attorneys.

The decree appealed from is affirmed in part, reversed in part, and remanded for the entry of a decree consistent with the views expressed herein.

*Affirmed in part; reversed in part; and remanded.*